The FIRST NATIONAL BANK OF
LOGANSPORT, Appellant,
(Defendant Below),

v.

LOGAN MFG. CO., INC., Donald F.
Moore, Sondra S. Moore, Clifford L.
Garrett and Judith Ann Garrett, Appel-
lees, (Plaintiffs Below).

No. 66S03–9106–CV–494.

Supreme Court of Indiana.

June 28, 1991.

Frank E. Tolbert, Miller Tolbert Muehl-hausen & Muehlhausen, P.C., Logansport, for appellant.

Robert E. Poynter, Roger Wm. Bennett, Bennett Boehning Poynter & Clary, Lafayette, for appellee.

Philip A. Whistler, Michael J. Lewinski, Ice Miller Donadio & Ryan, Indianapolis, amicus curiae for Indiana Bankers Ass'n, Inc.

## ON PETITION TO TRANSFER

KRAHULIK, Justice.

In a memorandum decision, the Court of Appeals affirmed, with certain amendments and corrections, the trial court's judgment against The First National Bank of Logansport, awarding $726,532 in damages for breach of a loan commitment, allegedly made to the plaintiffs below, Logan Manufacturing Co., Inc., Donald Moore, Sondra Moore, Clifford Garrett and Judith Ann Garrett (collectively "Garrett and Moore"). The bank has petitioned us to accept transfer of this case. We accept the request.

The issues presented are whether a contract to loan money was entered into by the parties and what damages are recoverable. The facts relevant to our discussion follow.

In 1982, Max Brandt was a senior vice president and senior loan officer at the bank. During this time, there was high unemployment in Logansport and Brandt was interested in bringing new industry to the area and in obtaining new business for the bank. In 1982, Brandt became aware of a small corporation in Michigan called Winamac Plastics Drinkwear which was undercapitalized and had suffered losses as the result of high rental payments, high labor costs and some questionable management practices, but which also was considering a move to Indiana. Representatives of the bank reviewed the products and potential of Winamac Plastics, its customer lists, contracts, equipment lists and appraisals, and its financial data, and determined that with additional capital and new management, the business was viable.

Thereafter, in late 1982, Garrett and Moore became interested in Winamac Plastics. In January 1983, Garrett and Moore met with Brandt at the bank. Numerous meetings and telephone conversations over the following weeks culminated in Brandt's determination that the bank would get involved with financing the business if Garrett and Moore were involved and the business moved to Logansport.

Both Garrett and Moore were told by Brandt that the limit on his lending authority was $100,000, and that requests for loans above that amount had to be approved by certain bank committees. Pursuant to that authority, Brandt approved a loan to Garrett and Moore personally for $100,000, $80,000 of which was to be used to acquire a two-thirds interest in the business for Garrett and Moore. Ultimately, Garrett and Moore borrowed a total of $100,000 from the bank.

In March, Brandt prepared a loan application for Winamac. The request was for a term loan of $420,000 and an operating loan of $120,000. At the same time, Brandt prepared a loan request for Garrett and Moore for $206,000 which included the

$80,000 already borrowed. Brandt submitted the Winamac loan request to the bank's loan committee and it was turned down because of the company's heavy debt load. When Garrett and Moore learned that the loan had been denied, they were upset and frustrated because they already had borrowed money from the bank and spent it on the project. Without additional loans, they would not be able to proceed with operation of the business.

Brandt assured Garrett and Moore that the bank would help them purchase the Winamac machinery and go into operation under a new corporate entity. Brandt encouraged them to continue the process of moving the business to Logansport and setting up a new corporation to operate it. Garrett and Moore decided to proceed in that fashion.

Brandt then prepared a new loan application using the name Logan Drinkwear, Inc., which was one of the names proposed by Garrett and Moore for the new corporation. Neither Garrett nor Moore were asked to sign the new application. This application, for a term loan of $346,000 and a line of credit of $250,000, was approved the same day it was submitted (four days after the Winamac application was denied) by both the officer's loan committee and the director's loan committee of the bank. Garrett and Moore were advised of the approval that day also.

On March 31, 1983, the bank issued letters of commitment for a $346,000 term loan and a $250,000 operating loan. This commitment provided, for the first time, that the term loan ($346,000) had to be guaranteed by the state. When Garrett and Moore questioned Brandt about this requirement, he indicated that the guaranty would be a good thing, but that the bank did not need it, and assured them that the bank would lend the money to buy the machinery whether or not the Indiana Economic Development Commission guaranteed the loan. The commitment also provided that Garrett and Moore would give the bank a security interest in the machinery, equipment, furniture and fixtures. The letters of commitment carried an expiration date of May 31, 1983. Subsequently, the bank refused to close on either loan. Garrett and Moore used the remaining $20,000 from the $100,000 initially borrowed, and they sought loans elsewhere without success, until 1987. Then, with loans from state agencies, they opened a similar plastics business in Iowa.

Garrett and Moore sued the bank for damages suffered as a result of its refusal to make the term loan and extend the line of credit as provided in the loan commitment letters, and proceeded to trial on the theories of breach of contract, breach of implied contract, promissory estoppel, interference with contractual relations, and fraud. Following a bench trial, a judgment in favor of Garrett and Moore in the amount of $726,532 was entered, consisting of the following components:

1. Lost profits from mid–1983 to mid–1987; $583,452
2. Loss of equity in their personal machinery and equipment; and $ 70,000
3. Out-of-pocket expenses. $ 73,080

Item one included lost profits from mid–1983, after the bank refused to make the loan, until mid–1987 when Garrett and Moore began operations in Iowa. Both sides presented expert testimony relating to the issue of lost profits.

The second item of damages was assessed for "the difference between the fair market value of assets which were repossessed and the fair market value as unrepossessed items." This finding refers to personal property owned by Garrett and Moore which secured a loan from a Crawfordsville bank unrelated to the loans in question here. After the defendant bank refused to go ahead with the loans at issue here, Garrett and Moore were unable to repay the Crawfordsville bank loan. The Crawfordsville bank then repossessed the personal property and sold it to satisfy the outstanding loan it had made. Garrett testified at trial that the value of the equipment repossessed was "somewhere between $70,000 and $80,000."

The third item of damages reflects the amount spent by Garrett and Moore in preparing to move the business from Michigan to Logansport and includes amounts

for monies spent on a facility in Logansport. This item of damage was computed as follows: total amount spent on preparing to operate the business in Logansport ($154,000) plus interest on this amount of eight per cent from June 1983 through December 1987 ($19,080), less the amount Garrett and Moore borrowed from the bank ($100,000), resulting in a sum of $73,080.

On appeal, the bank challenges both liability and damages. It claims that there was no enforceable oral agreement to make the loan, and that, because Garrett and Moore had failed to comply with the pre-closing conditions, one of which required that a state agency would guarantee the loan, the bank was not obligated to make the loan pursuant to the loan commitment. With respect to damages, the bank argues that the proper measure of damages was the interest rate differential or, alternatively, that Garrett and Moore had not adequately proved entitlement to lost profits. The Court of Appeals held that the trial court's determination of liability was not clearly erroneous and affirmed the award of lost profits. However, the Court of Appeals determined that the second item of damages was not reasonably foreseeable and the third item was included within the lost profits and, therefore, reversed the award of items two and three. In its petition to transfer to this Court, the bank again challenges the finding of liability for breach of contract and the award of damages for lost profits. Garrett and Moore, conversely, urge us to reinstate the award for the second and third items of damages.

### I. Oral Contract

■ The trial court concluded that there was an enforceable oral contract to lend money [1] as early as February 1983, and before any loan application was submitted to the bank on behalf of Garrett and Moore. We find this legal conclusion to be unsupported by the evidence.

The trial court found that Garrett and Moore were aware of the extent of Brandt's lending authority, that they knew that his individual lending authority reached only to loans of $100,000 or less, and that approval by the bank's loan committee was required for loans above that amount. It is uncontested that they also were well aware that in February 1983, the loan committee had not given authorization for any such loans to them. Garrett and Moore demonstrated this awareness by accepting a loan of $100,000, the maximum of Brandt's authority, and allowing Brandt to submit a separate loan application for the additional sums they desired to borrow. Thus, Garrett and Moore conclusively demonstrated that they understood that something more was required before any additional amounts would be loaned.

In addition, we must conclude there was no binding oral contract between the parties to lend additional sums because the parties had not agreed on any terms of any additional loans. The trial court found that there was no agreement as to the amount of loan, the rate of interest, the duration, the terms of repayment, or security for the loan, but concluded that the fact that the parties have left some matters to be determined in the future should not prevent enforcement if some other method of filling in the missing terms were available. Although we agree with this conclusion of law as a general principle of contract law, the trial court erred in applying it here.

The trial court, in essence, concluded that the bank was obligated to lend appropriate sums to obtain control of the plastics manufacturing business and to bring the same to Logansport and to operate it there without regard to how much money that might require. The findings of fact do not support the conclusion that the bank, through Brandt, made such an open-ended promise. Although we find no Indiana cases directly on point, we note that other jurisdictions hold that an oral promise to lend money may not be enforced when it is wholly indefinite as to all the essential elements of a loan agreement. *Kruse v.*

---

**1.** The loan to which the trial court refers here is in excess of the $100,000 actually lent by the bank. Because there is no dispute among the parties about this $100,000 loan, other than whether it showed the bank's intent to lend additional sums, future references to a "loan" are to the additional amounts.

*Bank of America* (1988), 202 Cal.App.3d 38, 248 Cal.Rptr. 217; *McErlean v. Union National Bank of Chicago* (1980), 90 Ill. App.3d 1141, 46 Ill.Dec. 406, 414 N.E.2d 128; *Union State Bank v. Woell* (1989), N.D., 434 N.W.2d 712; *Dennis Chapman Toyota, Inc. v. Belle State Bank* (1988), Mo.App., 759 S.W.2d 330; *Malaker Corp. v. First Jersey National Bank* (1978), 163 N.J.Super. 463, 395 A.2d 222, *cert. denied* 1979, 79 N.J. 488, 401 A.2d 243.

Garrett and Moore argue that the terms of an oral promise to lend money can be identified by referring to the facts surrounding the loan. However, the cases cited by them in support of this contention are distinguishable because they involve instances where there existed a previous course of dealing between the bank and the potential customer, *see, e.g., Nat'l Farmers Org. Inc. v. Kinsley Bank* (10th Cir.1984), 731 F.2d 1464, and, therefore, there was some method by which the missing terms could be supplied. Here, there was no history of business dealings between the parties.

Finally, we find no enforceable oral contract because there was no mutuality of obligation. Even if, as Garrett and Moore argue, the bank was obligated to lend additional sums of money as a result of Brandt's conversations with Garrett and Moore, the bank could not have forced Garrett and Moore to close the loan with the bank if, for example, they had decided to obtain financing elsewhere.

## II. *Written Contract*

█ Garrett and Moore contend (and the trial court concluded) that the missing terms of the oral contract purportedly formed in February were "filled in" when the loan application was approved by the bank in March and, thus, the contract was completely formed at that time and subject to being enforced. If so, this means that the contract was formed before the commitment letter was issued by the bank. As we have already concluded in the discus-

sion in section I, however, there was no enforceable oral contract formed before the commitment letter was issued. Yet, the submission and approval of the loan application connotes activity of a contractural nature and, therefore, we must examine whether a contract was formed at the time the commitment letter was issued.

In our view, the written loan application completed by or on behalf of Garrett and Moore was a solicitation for offers directed to the bank. The application was not an offer to borrow the money because, even if the application had been accepted by the bank, Garrett and Moore would still not have been obligated to borrow the money from the bank and any supposed contract would fail for lack of mutuality. Accordingly, the loan application must be viewed as a solicitation for offers. The issuance of the loan commitment by the bank constituted an offer by the bank to Garrett and Moore to lend the money pursuant to the terms and conditions of the commitment. In order to obligate the bank to comply with its offer, Garrett and Moore had to satisfy the preconditions that were a part of the offer within the period of time that the offer remained open.[2]

One of the conditions precedent contained in the loan commitment was a guaranty of the indebtedness by a state agency. It is axiomatic that a party seeking to enforce a contract must establish that all conditions precedent have been fulfilled, and that the burden of proof is on this party. *See, Penthouse Int'l v. Dominion Fed. Savings & Loan Assoc.* (1988) 2d Cir., 855 F.2d 963. Accordingly, at trial the burden fell on Garrett and Moore to establish that the conditions precedent were or could have been fulfilled. With respect to the required guaranty by a state agency, there was conflicting evidence concerning whether this condition could have been fulfilled, and the trial court concluded that it was "completely unknown" whether a state agency would have extended the guaranty. Therefore Garrett and Moore did not meet

**2.** Garrett and Moore argue that the bank was not entitled to insert conditions because there had been no discussion of them prior to the time when the commitment letter issued. Be-

cause we find that no oral contract existed before the letter was issued (see section I), this argument has no merit.

their burden of proving that this condition could have been fulfilled, and thus did not meet their burden of proving a valid acceptance of the bank's conditional offer to loan them money. Thus, no written contract was formed.

### III. *Promissory Estoppel*

The trial court also concluded that Garrett and Moore were entitled to relief on a theory of promissory estoppel because they had relied to their detriment upon Brandt's assurances that the bank would lend additional money. We agree. The Restatement (Second) of Contracts § 90 provides:

A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

That section has been approved and applied by the Indiana Court of Appeals, *see, e.g., Lyon Metal Products Inc. v. Hagerman Construction Corp.* (1979), 181 Ind.App. 336, 391 N.E.2d 1152, and is today adopted by this Court.

■ The doctrine of promissory estoppel encompasses the following elements: (1) a promise by the promissor (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise. *See Lyon Metal Products*, 181 Ind.App. 336, 391 N.E.2d 1152; *Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990. Thus, a promissor who induces a substantial change of position by the promisee in reliance upon the promise is estopped to deny enforceability of the promise. The reason for the doctrine is to avoid an unjust result in that justice and fair dealing require that one who acts to his detriment on the faith of a promise should be protected by estopping denial of that promise.

■ The doctrine of estoppel springs from equitable principles and is designed to aid the law in the administration of justice where, without its aid, injustice might result. Its purpose is to preserve rights previously acquired and not to create new ones. *Pepkowski v. Life of Indiana Ins. Co.* (1989), Ind., 535 N.E.2d 1164, 1167, quoting *State v. Mut. Life Ins.* (1910), 175 Ind. 59, 82, 93 N.E. 213, 222. Estoppel is "the misleading of a party entitled to rely on the acts or statements in question and a consequent change of position to his detriment." *Travelers Ins. Co. v. Eviston* (1941), 110 Ind.App. 143, 154, 37 N.E.2d 310, 314. Fraud need not be proven; "[i]t is sufficient if the conduct of the party has been knowingly such as would make it unconscionable on his part to deny what his conduct had induced another to believe and act upon in good faith and without knowledge of the facts." *Pitcher v. Dove* (1884), 99 Ind. 175, 177–78. *See also, Phar–Crest Land Corp. v. Therber* (1967), 251 Ind. 674, 681, 244 N.E.2d 644, 647.

■ A plaintiff may recover on a theory of promissory estoppel even in the absence of a contract. *Quake Construction*, 152 Ill.Dec. at 322, 565 N.E.2d at 1004. Promissory estoppel is an exception to the general rule that estoppel is not available upon promises to be performed in the future. *Reeve v. George–Pacific Corp.* (1987), Ind.App., 510 N.E.2d 1378, 1382. The doctrine of promissory estoppel can act as a substitute for lack of consideration or lack of mutuality. Unjust enrichment is not required, and the promissor need not receive any benefit or consideration from the transaction. *Citizens State Bank v. Peoples Bank* (1985), Ind.App., 475 N.E.2d 324, 327. Whether the promissor's action "constitutes a misrepresentation of current fact or an unfulfilled promise as to future action is irrelevant to the application of promissory estoppel." *Id.*

The doctrine has been applied by Indiana courts to enforce a gratuitous promise to convey land, *Larabee v. Booth* (1984), Ind. App., 463 N.E.2d 487, a promise to award construction contracts, *Lyon Metal Products*, 181 Ind.App. 336, 391 N.E.2d 1152, a promise to acquire a seat on an airplane, *Chow v. Trans World Airlines* (1989), Ind.

App., 544 N.E.2d 548, and recognized as a possible theory of recovery for a breach of promise to lend money, *Security Bank & Trust Co. v. Bogard* (1986), Ind.App., 494 N.E.2d 965. One who alleges and relies on the doctrine has the burden to establish all facts necessary to support its application. *Phar–Crest*, 251 Ind. 674, 244 N.E.2d 644.

We turn now to an examination of the facts to determine whether each of the five elements have been established. First, was there a promise? We believe so. The trial court found that participation in the business by Garrett and Moore was suggested by Brandt. From the beginning of the relationship, the bank, through Brandt, was aware that Garrett and Moore needed funds from the bank to invest in and operate the plastics business. Brandt indicated that the bank was willing to lend the money to Garrett and Moore for this purpose. All parties knew that large sums, in addition to the $100,000 authorized by Brandt, would be necessary to move and operate the plastics business. From the beginning, Brandt represented to Garrett and Moore that the bank would provide the financing. Brandt made the initial loan of $100,000 with complete knowledge that it would be used by Garrett and Moore to obtain a financial interest in the plastics business, move the business to Logansport, and prepare a building for its operation there. Brandt also had complete understanding that $100,000 would not be sufficient money to accomplish this end, and knew that none of the $100,000 would benefit Garrett and Moore unless the business actually moved to Logansport. Brandt talked to Garrett and Moore several times concerning their spending of the $100,000 loan; the bank was kept advised about how the loan proceeds were being spent; it questioned Garrett and Moore about some expenditures and directed the use of some of the funds. After the loan application for $540,000 made in the name of Winamac Plastics was denied, Garrett and Moore sought and received assurances from Brandt that the bank would help Garrett and Moore buy the machinery under a different corporate entity. At this time, Brandt continued to encourage Garrett and Moore to proceed with moving the business to Indiana. We find that these representations and actions on the part of the bank justified the trial court's conclusion that a promise to lend additional sums was made by the bank during this period.

Even though there were insufficient terms for the enforcement of an express oral contract (see our discussion in section I), and unfulfilled pre-existing conditions prohibiting recovery for breach of a written contract (see section II), we are not precluded from finding a promise under these circumstances. Indeed, it is precisely under such circumstances, where a promise is made but which is not enforceable as a "contract," that the doctrine of promissory estoppel is recognized.

Turning to elements two, three and four, we think it clear these requirements have been met. The bank should have reasonably expected that Garrett and Moore would rely on the bank's representations that the loan would be made. In addition, the trial court found the bank had actual knowledge of such reliance as a result of continued conversations among Brandt and Garrett and Moore and Brandt's participation in directing the use of the $100,000 loan. Indeed, it would be unusual for a lender under these circumstances not to expect or anticipate that a promise to lend needed money would induce a borrower to rely on the promise by making preparations for the loan as did Garrett and Moore, or to cease searching to borrow the money elsewhere. *See Malaker Corp. v. First Jersey Nat'l Bank* (1978), 163 N.J.Super. 463, 474, 395 A.2d 222, 231. Garrett and Moore's actions in reasonable reliance on Brandt's promise were of a definite and substantial character because they borrowed $100,000, for which they were personally liable, and spent most of the loan proceeds on preparing to move the business to Logansport.

The fifth element is whether injustice can be avoided only by enforcement of the promise. Again, we believe so. Even though the parties' dealings up to the time of the issuance of the commitment letter formed no contract, Brandt's representations and actions induced Garrett and

Moore to reasonably rely on the loan being made in the future. In reliance on the representations, Garrett and Moore began making arrangements and spending money on moving the business to Logansport expecting that the additional money needed would be made available. We think it clear that had Garrett and Moore known that the loan commitment would contain conditions they could not meet or that the loan ultimately would not have been made, they would not have spent the proceeds from the $100,000 loan until they had secured alternative financing. An injustice would result if Garrett and Moore were penalized for relying on the representations made by the bank's loan officer when the loan officer was aware of and participated in the actions of Garrett and Moore which constitute reliance. It would also be unjust for the bank to recoup the $100,000 originally loaned, without imposing on it the responsibility for the actions of its lending officer.

All five elements of promissory estoppel are established by the evidence and the trial court's findings in this regard are affirmed.

### IV. *Damages*

■ Having found that the doctrine of promissory estoppel applies to the facts of this case, we must determine the measure of damages due Garrett and Moore. The trial court, having found an enforceable contract, awarded expectancy damages in the form of lost profits (item one), consequential damages in the form of the reduced value of equipment repossessed (item two), and reliance damages measured by the amounts spent by Garrett and Moore in preparing to move the company to Logansport (item three). The Court of Appeals affirmed item one, but vacated the award of item two because it was not within the contemplation of the parties at the time a contract was formed and vacated item three because it was included within lost profits.

Having concluded that the appropriate theory of recovery is promissory estoppel, we look again to the Restatement for guidance on the measure of damages. Section 90 provides that "[t]he remedy granted for breach may be limited as justice requires." Comment (d) to the Restatement (Second) of Contracts provides:

[T]he same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than the terms of the promise.... Unless there is unjust enrichment of the promissor, damages should not put the promisee in a better position than performance of the promise would have put him.

As to the measure of damages, we find this case analogous to Illustration eight contained in the comments to the Restatement:

A applies to B, a distributor of radios manufactured by C, for a "dealer franchise" to sell C's products. Such franchises are revocable at will. B erroneously informs A that C has accepted the application and will soon award the franchise, that A can proceed to employ salesmen and solicit orders, and that A will receive an initial delivery of at least 30 radios. A expends $1,150 in preparing to do business, but does not receive the franchise or any radios. B is liable to A for the $1,150 but not for the lost profit on 30 radios. Compare Restatement, Second, Agency § 329.

We conclude that under the circumstances here, damages such as are required to prevent injustice are those referred to as "reliance damages." Those damages, as determined by the trial court, are those included within item three and total $73,080. We conclude that justice does not require the award of lost profits, and it is therefore vacated. In addition, the award for a decrease in value to certain equipment is also vacated because there is a lack of evidence in the record to support an award for this item of damage.

### V. *Conclusion*

Accordingly, we now grant transfer. The opinion of the Court of Appeals is hereby vacated and the judgment of the trial court is reversed. This cause is remanded to the trial court with instructions

to enter judgment in favor of plaintiffs for $73,080.

SHEPARD, C.J., and DeBRULER and GIVAN, JJ., concur.

DICKSON, J., dissents without separate opinion.